## Adkins et al. v. Osborne.

(Decided Nov. 29, 1938.)

614

■■■■■■■■■■■■■■■■■■■

C. R. LUKER and OSCAR W. BLACK for appellants.
WILLIAM A. HAMM for appellee.

Opinion of the Court by Stanley, Commissioner—
Reversing.

On April 18, 1927, C. B. Adkins and wife deeded a parcel of land to Clifford Osborne for the consideration of $2,000, of which $400 was cash and the balance evidenced by a number of notes payable monthly beginning January 1, 1928, the last maturing November 1, 1930. On March 1, 1934, Osborne paid the balance due (except a disputed check) on the purchase money notes. In February, 1936, this suit was instituted by Osborne against Adkins and wife in which he claimed there were only 8.62 acres in the tract which he alleged had been represented to contain 12 acres. For this deficit of 3.38 acres he asked judgment for $573.20, being at the rate of $166.66 an acre. He also alleged that he had paid the entire purchase money of $2,000, but the vendors had refused to release the lien retained to secure the payment of the notes, and he asked that they be compelled to do so or that it be done by the court. By amended petition the shortage was claimed to be 3.66 acres instead of 3.38, and the prayer for judgment was proportionately increased. The averments with respect to the representation of the tract containing 12 acres and that it was sold by the acre were elaborated. The defendants joined issue and entered an affirmative plea respecting the representations of the land, and presented a counter-claim for $66, with interest, covering a "cold check," to be described. The Court rendered judgment for the plaintiff for $609.97 and dismissed the defendants' counter-claim. They appeal.

Since the controversy over the unpaid check seems to have been the cause of the claim of the shortage, we consider it first.

It appears that Osborne did not meet his notes promptly and the vendors exercised leniency. When a check would be received the note which it paid would be returned to Osborne. On several occasions those checks were not honored by the bank upon which they were drawn. Osborne would later satisfy them by money orders or cashier's checks. Adkins insisted from the time it was given that a check for $66 sent him in Sep-

tember, 1932, was never satisfied. Adkins testified that this check had been promptly deposited in his bank in Logan, West Virginia, and he did not learn of its dishonor until he returned from a vacation about two months later. He was given the "cold check" to which were attached a "debit slip" of his bank charging the amount back to his account, and a "return slip" showing it had been dishonored because "Not Sufficient Funds." From that time on he insisted with Osborne that it should be but it was never paid. The "debit slip" shows the check had been credited to Adkins' account on September 28, 1932. It bears some illegible notation which Mr. Gillispie, an officer of the bank in Corbin where Osborne transacted his business, testified was either "Son," "Sov" or "Sav., No. 12473." Adkins had sent the check itself back to Osborne but kept the slip. Adkins testified that in talking with Osborne about two years afterward about this check not having been satisfied, Osborne made a complaint about not having obtained a spring on the other side of the creek from the land which he had purchased. He replied, "You got what the deed called for, didn't you?" and Osborne said, "Yes." He also said, "I guess I owe you all right," and suggested that if Adkins would buy "this strip of land back here and straighten up my line I will pay that." Among the exhibits filed by Osborne with his deposition is a letter dated August 6, 1934, from Adkins in which he wrote, "I have checked at the bank and the check we were talking about—check dated 9-28-32 has never been paid." He explained in this letter that his banker and lawyer had advised him he had the right to collect it. He offered to accept Osborne's note for one year in settlement. C. R. Brannon, who lived on an adjoining farm, had been instrumental in selling the property for Adkins to Osborne, and it appears that Adkins had solicited his aid in collecting this dishonored check. Mrs. Brannon testified that Osborne had said to her, "I will not say that I don't owe it; I guess I do but I am not going to pay it." Adkins had sent a deed of release of the lien to Brannon to be delivered to Osborne when he should satisfy this check. Brannon testified that Osborne did not claim he had paid it.

In defense of this counter-claim on the check, Osborne insisted that he had never given any check for $66, as claimed; that the check in controversy was one

given by him bearing date of June 1, 1932, for $65.50. It had been returned, but satisfied by a cashier's check dated June 15th. He had given another check on July 1, 1932, for the same amount, $65.50, which was the principal and interest of a $50 note. He denied having received the alleged "cold check" through the mail and of having made the statements attributed to him by Adkins, Brannon and Mrs. Brannon that he owed the sum. Mr. Gillispie, upon whose bank the checks had been drawn, testified as to the giving of the cashier's check on June 15th for $65.50 and the final one on March 1, 1934. He had examined the records of the bank and found no check had been charged back to Osborne during September, October or November, 1932. We do not think this signifies anything, for if the check drawn upon Osborne's account was dishonored because of insufficient funds the bank would have had no occasion to charge it back to his account. It would simply have returned the check to the forwarding bank. Having testified as to the memorandum on the debit slip as possibly being "Sav. No. 12473" he stated that the check on June 1, 1932, had the same number endorsed on it. The witness suggested that some banks charge a fee for services where a check has been charged back, which is usually from 50 cents to $1, and the charge to Adkins of $66 may have been the $65.50 check, plus a fee. On the other hand, it may be noted that 50 cents is two months' interest of a $50 note, and none had been paid since July 1, 1932, so that a $66 check would be in order. We think there is more reason to assume that the endorsement "Sav. No. 12473" is the number of a savings account which Adkins had in his bank, for it would have been a regular process for the number to be placed on any check charged back to it. It seems to us, therefore, that the evidence supports the conclusion that this $66 check was never satisfied and that a judgment should have been rendered for the defendants on their counter-claim.

Rules to be applied in a case where there is a shortage of land involved are thus given in Morris v. McDonald, 196 Ky. 716, 245 S. W. 903, 904:

"If the sale is by the acre, compensation for any discrepancy, no matter how small, will be allowed; but if it is in gross, the rule is that the deficit must be as much as 10 per cent. before the complaining party is entitled to relief. The latter

rule, however, is subject to two well-established exceptions laid down in Harrison v. Talbot, 2 Dana 258, and consistently followed by this court. The first is a sale, strictly and essentially by the tract, without reference in the negotiations or contract to any estimated or designated number of acres; and the second is, where a supposed quantity, by estimation, is mentioned or referred to in the contract, but the reference is only for the purpose of description and in such circumstances or in such manner as to show that the parties intended to risk the contingency of quantity, whatever it might be. In neither of these classes of cases will the contract be modified by the chancellor, if no fraud is shown to exist.''

The material part of the deed to the tract is as follows:

"A certain tract or parcel of land lying in Laurel County, Kentucky, on London and Corbin Pike and being the same land conveyed to the first parties by W. F. Martin and Roxie Martin, his wife, by deed bearing date October 11th, 1924, which is duly recorded in Deed Book No. 67, page 442, Laurel County Court Clerk's Office, containing 12 acres, more or less, and bounded as follows, to-wit: Beginning at a stake in middle of road leading from the pike to the big gate; thence with the center of the road a westerly direction to the branch; thence up the branch to a gum, a corner of Allen West; thence with the old rail fence an easterly direction to a stone in the edge of the pike a corner of Allen West; thence with said pike to the beginning.''

The plaintiff, Osborne, testified he had been shown the place by Brannon. Later Adkins had come to Laurel County from his home in West Virginia and showed him over it, pointing out the corners. There were a small dwelling house and crib on it. Adkins told him there were 12 acres in the parcel. He estimated it was worth $200 an acre and the price of $2,000 would figure less than that so he decided to buy the place. He lived near by and moved on the property after he bought it. He admits that he made no complaint of a shortage until the controversy arose about the "cold check" described above. Brannon, who, as we have stated, arranged the deal, was present during the discussions between Adkins and Osborne. He testified that

nothing was said about the acreage; that it was sold by the boundary; that next morning after the parties had gone over the place Adkins had said, "Now, son, or brother, or something, he called him, he says, after I have made this trip here, I would rather you wouldn't take the place, but if you want it right the way it lays, all right." Osborne then said, "I will take it." The witness is positive that there was never anything said about there being 12 acres. Adkins testified that he showed the property to Osborne; told him he had never had the lines run, and the only thing he could sell him was what the deed called for and that he sold it by the boundary. Osborne "seemed to be picayunish," and Adkins told him he would rather he did not take it. There was never at any time any figure or anything said about the acreage.

We, therefore, have the evidence of Adkins and Brannon on the one side, and Osborne alone on the other. Brannon is Osborne's neighbor, and there is nothing in the record to indicate that he was not friendly to him. However, there is the reference in the deed to "12 acres, more or less." But it is to be observed that this is not given as part of the description of the land, and is contained in Adkins' source of title and in the reference to his deed. It would, therefore, seem to indicate that its mention was for the purpose of description or identification rather than as a representation of area. It is difficult to understand how a man can live on a small tract of land for over seven years without having discovered that the area was not 12 acres, as sold to him, but 8.34 acres, that is, that there was a shortage of over 30 per cent. The delay in so claiming and the circumstances which precipitated that claim at so late a period strongly support the idea that the sale and purchase was of the tract as a unit and not of any certain acreage.

The rule in equity cases is that this court will for itself determine matters of fact from the record, but if there be a doubt we will accept the chancellor's finding of fact. Weighing the evidence in this case for ourselves, we have had little difficulty in concluding that the plaintiff purchased the land as a parcel and that he did not establish a right to recover a proportionate part of the money paid for it by reason of any misrepresentation or mistake in the area.

Accordingly the judgment is reversed.